RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
BRANDON C. JAROCH
Assistant Federal Public Defender
411 E. Bonneville Ave., Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
brandon_jaroch@fd.org

Attorney for Brandon Patton

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:19-cr-00209-APG-EJY |
| Plaintiff, | **Second Emergency Motion to Reopen Detention Hearing Due to COVID-19 Pandemic** |
| v. | |
| BRANDON PATTON, | |
| Defendant. | |

## <u>Introduction</u>

BRANDON PATTON again moves this Court for an order granting his immediate release due to the COVID-19 pandemic. Mr. Patton, who is a defendant detained at the Nevada Southern Detention Center, is among the group of people the Centers for Disease Control and Prevention ("CDC") categorizes as being most-at-risk for contracting COVID-19, a dangerous virus

1   has spread across the world and hitting Nevada and the United States extremely

2   hard.

3      The health risk to Mr. Patton is a compelling reason to grant release. Mr.

4   Patton has a heightened risk of contracting severe forms of the COVID-19 virus

5   because of his myriad of underlying health conditions,[1] including Congestive

6   Heart Failure, Chronic Obstructive Pulmonary Disease ("COPD"), Diabetes, and

7   High Blood Pressure.[2]   At the previous hearing the government did not dispute,

8

9     [1] Given that the government has conceded that Mr. Patton has these

10  conditions and that medical records have been previously provided to the Court, they are only referenced in this filing.

  [2] Medication List for Mr. Patton:

11
  a. *Furosemide* - used to reduce extra fluid in the body (edema) caused
12     by conditions such as heart failure, liver disease, and kidney disease. This drug is also used to treat high blood pressure.

13    b. *Albuterol* - used to prevent and treat wheezing and shortness of breath caused by breathing problems (such as asthma, chronic obstructive pulmonary disease).

14    c. *Albuterol-ipratropium* - used to treat and prevent symptoms
15     (wheezing and shortness of breath) caused by ongoing lung disease (chronic obstructive pulmonary disease-COPD which includes bronchitis and emphysema). This product contains 2 medications:
16     ipratropium and albuterol (also known as salbutamol). Both drugs work by relaxing the muscles around the airways so that they open up and you can breathe more easily.

17    d. *Diltiazem* - used to prevent chest pain (angina).

18    e. *Hydralazine* - used with or without other medications to treat high blood pressure.

19    f. *Isosorbine mononitrate* - used to prevent chest pain (angina) in patients with a certain heart condition (coronary artery disease).

20    g. *Labetalol* - used with or without other medications to treat high blood pressure (hypertension).

21    h. *Lisinopril* - used to treat high blood pressure.

and the Court found, that Mr. Patton has most all of the conditions, other than age, that make him extremely susceptible to complication from COIVI-19 and legitimately threaten his life.  ECF No. 30.  Given the conditions at the BOP and Nevada Southern Detention Center ("NSDC"), as described below, an order granting release is necessary.

**Factual Background**

1. **The COVID-19 pandemic constitutes an emergency that warrants Mr. Patton's immediate release.**

The BOP has handled the pandemic about as well as it handled its responsibility to apply for compassionate release for qualifying individuals.  By mid-June, the five largest clusters of COVID-19 in this country had grown inside correctional institutions.[3]  In the previous month, the number of known infected incarcerated people doubled and prison deaths increased by 73%.[4]  Testing remains of paramount importance, as one in seven virus tests conducted on

---

    i.  *Ondansetron* - used alone or with other medications to prevent nausea and vomiting caused by cancer drug treatment (chemotherapy) and radiation therapy.

    j.  *Spironolactone* - used to treat heart failure, high blood pressure (hypertension), or hypokalemia (low potassium levels in the blood).

    k.  *Tiotropium* - used to treat lung diseases such as asthma and COPD (bronchitis, emphysema).

[3] Timothy Williams, *et al.*, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, June 16, 2020, available at https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html.

[4] *Id.*

3

incarcerated people have come back positive, and the vast majority of positive people in prion are asymptomatic, yet still shed the virus.[5]  Yet, in some facilities, the BOP has no plans to test at all.[6]

As of July 17, 2020, COVID-19 has expanded its foothold to 98 BOP facilities and 47 RRCs.[7]  These numbers have increased from 93 and 41, respectively, within several days.  There are currently 3,483 federal inmates and 295 BOP staff who have confirmed positive results for COVID-19.  The inmate count increased by 82 within the last two days.  Ninety-five federal prisoners have died from the disease.  The below graphic showing active cases is from the BOP website:



_____

[5] *Id.*

[6] *See United States v. Adeyemi*, 2020 WL 3642478, at *5 (E.D. Pa. July 6, 2020)

[7] https://www.bop.gov/coronavirus/ (Last accessed July 17, 2020).

1    These numbers are alarming, will continue to grow, and likely understate the

2    true prevalence of COVID-19 in jails and prisons.[8]  The BOP's handling of the

3    COVID-19 pandemic has drawn harsh criticism[9] and a flurry of lawsuits.[10]

4        The situation at NSDC is no better.  As of July 15, 2020, the last update

5    received from the marshals, there are currently 11 positive inmate cases and 9

6    positive staff cases.  Again, these numbers are likely much higher and change in

7    an instant: NSDC has only recently began sporadic testing of symptomatic

8    inmates who it knows have been exposed to confirmed positive individuals.[11]  A

9    recently filed complaint describes in great detail alarming conditions at NSDC,

10   including that detainees are not given proper masks to wear; staff do not always

11   wear masks; lack of testing; staff members moving between quarantined and

12   non-quarantined units resulting in cross-contamination; and failing to follow

13

14

---

15   [8] Aspinwall C, Neff J. These prisons are doing mass testing for COVID-
16   19—and finding mass infections.  (Accessed June 15, 2020)
     https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-
     testing-for-covid-19-and-finding-mass-infections;
17   Schneider  EC.  Failing the test—the tragic data gap undermining the US
     pandemic response.  *N Engl J Med*. Published online May 15, 2020.
     doi:10.1056/NEJMp2014836.

18   [9] https://www.usatoday.com/story/opinion/policing/2020/05/21/bureau-
     prisons-response-covid-dangerous-public-deserves-answers/5220095002/.

19   [10] https://www.sltrib.com/news/2020/07/13/federal-inmates-sue-weber/.

20   [11] *See, e.g., U.S. v. Martell-Perkins*, 2:17-cr-00129-APG-NJK ECF No. 66
     (emergency request for COVID-19 testing explaining that testing is being denied
     despite lost of taste and smell); *U.S. v. Delon Hunter*, 2:12-CR-00132-JAD-VCF
21   (same).

CDC and BOP policy regarding proper quarantining of infected inmates.[12]
Perhaps most disturbing is the facility's cavalier attitude: the complaint
describes a unit manager telling frightened inmates "it is what it is" and "I hope
you have a good lawyer.  I'll be waiting for your lawsuit.  Good luck with that."[13]
The facility has gone so far as to assign staff members from other units into
infected units as punishment.[14]  Some staff members have reportedly quit over
the conditions there.

Although it goes without saying that jails and prisons create a hospitable
environment for the spread of contagious disease,[15] a recent study has confirmed
this, and that COVID-19 is more deadly for prisoners.  On July 8, 2020, the
American Medical Association published a research letter entitled "COVID 19
Cases and Deaths in Federal and State Prisons."  The paper concluded that the

---

[12] *See Nagel v. Core Civic, et al.*, 2:20-cv-01279-GMN-DJA ECF No. 1-1 at 3–4.

[13] *Id.* at 5

[14] *Id.*

[15] Centers for Disease Control and Prevention, *Guidance for Correctional Detention*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (Correctional and detention facilities "present unique challenges for control of COVID-19 transmission among incarcerated/detained persons [and] staff[.]"); "Achieving A Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS (incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings").

COVID-19 rate for prisoners was 5.5 times higher than the U.S. population and that prisoners were three times more likely to die from the disease.[16]

The virus is now spreading through the NSDC at an alarming rate.  This is the tinderbox of disease[17] scenario healthcare professionals have been warning about for months. The NSDC is sitting on a time-bomb of COVID-19 cases.  Yet, instead of decreasing the number of people in the jail or conducting widescale testing, the jail is simply waiting, watching, and hoping no new individuals begin exhibiting symptoms.  It is clear this is not a feasible solution.  A look at the explosion of cases within BOP facilities quickly confirms that.[18]

As the stress of the situation rises, because the men have been locked down for weeks and people continue to get sick, tension among the detainees reached a breaking point.  On Friday, June 19, a riot broke out in Unit G2 and correctional officers deployed tear gas into the confined space.  As a result,

---

[16] https://jamanetwork.com/journals/jama/article-abstract/2768249.

[17] Kimberly Kindy, An Explosion of Coronavirus Cases Cripples Federal Prison in Louisiana, Wash. Post (Mar. 29, 2020), https://wapo.st/2zmHLAx; *see also United States v. Brown*, No. 4:05-CR-00227-1, 2020 WL 2091802, at *2 (S.D. Iowa Apr. 29, 2020) ("Already 'tinderboxes for infectious disease,' prisons now are even more dangerous than we typically accept."); *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (same); *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (noting medical officials warning of "tinderbox scenario" in prisons).

[18] As of June 22, 2020, there have been 6,989 positive cases and 88 deaths. https://www.bop.gov/coronavirus/ (last visited June 22, 2020).  Out of 2,700 tests conducted nationwide by the BOP, nearly 2,000 came back positive—roughly 70 percent.  Michael Balsamo, Over 70% of Tested Inmates in Federal Prisons have COVID-19, AP News (Apr. 29, 2020), https://bit.ly/2WNrsEy ("70% of tested inmates").

several detainees have been confined to the Solitary Housing Unit ("SHU")—not to control the virus, but rather to keep the peace within the facility.  These detainees, many of whom were doused with pepper spray, spent days in solitary confinement without access to a shower or clean clothing.  To control air flow, the air conditioning in the SHU was turned off.  The temperatures in Pahrump have been exceeding 100 degrees.  This cannot be the solution.

The government has consistently maintained the NSDC has a strict 14-day quarantine of all new arrivals, with a COVID-19 screening procedure to prevent the spread of the virus and keep all detainees safe.  But the incidents leading up to this current outbreak show the NSDC is not following its own procedures.  A San Bernardino County detainee, who several people claim was exhibiting symptoms upon his arrival, was placed into the general population four days after his arrival to NSDC causing the virus to spread through the NSDC. The circumstances at the NSDC show that detainees cannot be protected.



**Figure. Trends in Cumulative Coronavirus Disease 2019 (COVID-19) Confirmed Case Rate per 100 000 People for Prison and US Populations**

Data are from the UCLA Law COVID-19 Behind Bars Data Project and the US Centers for Disease Control and Prevention.[3,4] The US population is 327 167 439 and the US prison population is 1 295 285.

**Table.** Mortality Attributable to Coronavirus Disease 2019 (COVID-19) Among Prison and US Populations

| Population by age group, y | Prison population in 1000s[a] | US population In 1000s[b] | COVID-19 deaths[c] | Age-specific COVID-19 mortality rate/100 000 | Expected prison deaths/100 000[d] |
|---|---|---|---|---|---|
| **Men** | | | | | |
| ≤24 | 115 | 52 333 | 87 | 0.17 | 0.19 |
| 25-34 | 377 | 22 727 | 433 | 1.91 | 7.19 |
| 35-44 | 331 | 20 257 | 1184 | 5.84 | 19.32 |
| 45-54 | 222 | 19 923 | 3236 | 16.24 | 36.12 |
| 55-64 | 117 | 19 865 | 7558 | 38.05 | 44.36 |
| ≥65 | 37 | 23 923 | 38 899 | 162.60 | 60.59 |
| **Women** | | | | | |
| ≤24 | 8 | 50 545 | 50 | 0.10 | 0.01 |
| 25-34 | 36 | 22 482 | 207 | 0.92 | 0.33 |
| 35-44 | 28 | 20 770 | 465 | 2.24 | 0.63 |
| 45-54 | 16 | 20 776 | 1352 | 6.51 | 1.06 |
| 55-64 | 6 | 21 890 | 3881 | 17.73 | 1.10 |
| ≥65 | 1 | 28 865 | 38 254 | 132.53 | 1.90 |
| Total[e] | 1295 | 324 356 | 95 608 | 29.47 | 172.80[f] |

[a] Derived from 2018 published estimates from US Bureau of Justice statistics (https://www.bjs.gov/content/pub/pdf/p18.pdf).

[b] Estimated from 2019 US Census Bureau data (https://www.census.gov/data/tables/2019/demo/age-and-sex/2019-age-sex-composition.html).

[c] Estimated from the US Centers for Disease Control and Prevention as of June 6, 2020 (https://data.cdc.gov/NCHS/Provisional-COVID-19-Death-Counts-by-Sex-Age-and-S/9bhg-hcku).

[d] Calculated as the age-specific mortality rate in the US population × the prison population.

[e] The age- and sex-standardized mortality ratio is 510/172.8 = 2.95 and was calculated as the observed prison deaths as of June 6, 2020/expected US deaths as of June 6, 2020.

[f] Because prison deaths attributable to COVID-19 are not reported by age and sex strata, an indirect standardization method was used.

Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common."  As Judge Brody of the Eastern District of Pennsylvania observed in the early days of the pandemic, "nothing could be more extraordinary and compelling than this pandemic."[19]  That Mr. Patton is, solely by virtue of her incarceration, five times more likely to contract COVID-19 and three times more likely to die from the disease is alone an extraordinary and compelling reason to grant his release.  This is compounded by the fact that Mr. Patton has conditions that place him at a higher risk to become seriously ill and even die from COVID-19.

### 2. Conditions of Confinement and Spread of Coronavirus

Conditions of confinement create the ideal environment for the transmission of contagious disease.[20]  Inmates cycle in and out of detention facilities from all over the world and country, and those who work in detention facilities—including correctional officers and care and service providers—leave and return to those facilities daily without COVID-19 screening.  Additionally, incarcerated individuals often suffer poorer health than the general population.

---

[19] *United States v. Rodriguez*, 2020 WL 1627331, at *2 (E.D. Pa. April 1, 2020).

[20] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047-1055 (2007), https://doi.org/10.1086/521910.

1    Even when not faced with a potentially deadly pandemic, incarcerated

2    individuals received limited medical care.[21]

3          Faced with this pandemic, incarcerated individuals who are older or have

4    chronic health conditions like diabetes, asthma, high blood pressure, hepatitis, or

5    HIV, are especially vulnerable to severe forms of COVID-19.

6          According to public health experts, incarcerated individuals "are at special

7    risk of infection, given their living situations," and "may also be less able to

8    participate in proactive measures to keep themselves safe" because "infection

9    control is challenging in these settings."[22]   In order to reduce the impact of

10   COVID-19 on jails and prisons, experts advise against incarcerating people who

11   are not a public safety risk.  Tyler Winkelman, co-director of the Health,

12   Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research

13   Institute in Minneapolis, advises "we are increasing [the detainees] health risk

14

15

16

17       [21] U.S. Dep't of Justice, Bureau of Justice Statistics Laura M. Maruschak,
     Marcus Berzofsky, and Jennifer Unangs, *Medical Problems of State and Federal*

18   *Prisoners and Jail Inmates*, 2011-2012 at 1-22 (Feb. 2015), https://www.bjs.gov/
     content/pub/pdf/mpsfpji1112.pdf.

19       [22] "Achieving a Fair and Effective COVID-19 Response: An Open Letter to
     Vice-President Mike Pence, and Other Federal, State, and Local Leaders from

20   Public Health and Legal Experts in the United States," (March 2, 2020),
     https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-

21   19_letter_from_public_health_and_legal_experts.pdf.

by keeping them [incarcerated] . . . . [t]his is the time to make sure we have as few people at risk as possible."[23]

Internationally, COVID-19 is a grave concern for those detained in prisons. In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases in February 2020.[24]  Secretary of State Mike Pompeo has called for the release Americans detained in Iranian prisons because of the "deeply troubling" "[r]eports that COVID-19 has spread" to its prison system, noting "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[25]  Courts across Iran have granted 54,000 inmates furloughs as part of the protective measures to contain COVID-19 across the country.[26]

---

[23] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap.

[24] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus as More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2.

[25] Jennifer Hansler and Kylie Atwood, *Pompeo Calls for Humanitarian Release of Wrongfully Detained Americans in Iran Amid Coronavirus Outbreak*, CNN (Mar. 10, 2020), https://www.cnn.com/2020/03/10/politics/mike-pompeo-iran-release-detained-americans-coronavirus/index.html.

[26] Claudia Lauer and Colleen Long, *US Prisons, Jails on Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020), https://apnews.com/af98b0a38aaabedbcb059092db356697.

In the United States, numerous jurisdictions have already taken steps to facilitate the release of both incarcerated pretrial detainees and convicted inmates to reduce the prison population during this national crisis.  As part of this movement, jurisdictions are releasing older inmates and sick inmates, and discouraging or refusing incarceration of individuals arrested on non-violent misdemeanor charges and expediting the plea and bail process.[27]

## Argument

### 1.  The Bail Reform Act Requires Brandon Patton's Release.

For purposes of release, Mr. Patton's offense is generally subject to detention,[28] but release is warranted if Mr. Patton can demonstrate two factors: (1) "by clear and convincing evidence that [he] is not likely to flee or pose a danger to the safety of any other person or the community if released" under 18

---

[27] In New York, Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners (Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020), https://theappeal.org/sentenced-to-covid-19/); Cuyahoga County (Ohio) is holding mass pleas and bail hearings to reduce the current jail population (https://www.cleveland.com/court-justice/2020/03/cuyahoga-county-officials-will-hold-mass-plea-hearings-to-reduce-jail-population-over-coronavirus-concerns.html); Mahoning County (Ohio) jail is refusing all non-violent misdemeanor arrestees (https://www.wkbn.com/news/coronavirus/mahoning-county-jail-refusing-some-inmates-due-to-coronavirus-outbreak*); see also* Collin County (TX) (https://www.dallasnews.com/news/public-health/2020/03/12/facing-coronavirus-concerns-collin-county-sheriff-asks-police-not-to-bring-petty-criminals-to-jail/).

[28] *See* 18 U.S.C. § 3143(a)(2). Mr. Patton pled guilty to a firearm offense under 18 U.S.C. § 924(c), which falls under 18 U.S.C. § 3142(f)(1)(B) as it is "an offense for which the maximum sentence is life imprisonment or death."

U.S.C. § 3143(a)(1); and (2) "exceptional reasons why [his] detention would not be appropriate."  18 U.S.C. § 3145(c); *see United States v. Garcia*, 340 F.3d 1013, 1015 (9th Cir. 2003).

The Ninth Circuit gives the term "exceptional reasons" a wide interpretation, "plac[ing] broad discretion in the district court to consider all the particular circumstances of the case before it and draw upon its broad experience with the mainsprings of human conduct." *Garcia*, 340 F.3d at 1018 (citation and internal quotation marks omitted).  There is "no limit on the range of matters the district court may consider" and "a wide range of factors may bear upon the analysis" for "exceptional reasons" warranting release.  *Id.* at 1018-19.

Normally, if "the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c)," the judicial officer shall order the person's release.[29]  Given this extraordinary and unprecedented time in history and the lethality of COVID-19, Mr. Patton requests consideration of release even if he is subject to any heightened detention requirements.[30]

---

[29] 18 U.S.C. § 3143.

[30] *Id.* at § 3143(a)(2).

Due to the crucial interests involved, a "case-by-case" approach is required at any stage of the case in assessing the propriety of continued detention.[31]  The courts have long recognized there is no greater necessity than keeping a defendant alive, no matter the charge.  When our society does "punish [a person], we do not act cruelly."[32]

The circumstances, that existed when Mr. Patton was ordered detained and when his prior motion was denied, have now changed.  The past four months shows that the pandemic is ongoing largely uncontrollable and poses a direct risk far greater with Mr. Patton's continued detention.  As explained above, the condition inside the NSDC is the ideal environment to spread of a pandemic disease. Mr. Patton is particularly vulnerable because his pre-existing health conditions increases the risk of fatal complications if he were to be infected.

This Court should consider the "total harm and benefits to prisoner and society" that continued imprisonment of Mr. Patton will yield, relative to the

---

[31] *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted).

[32] *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC").

1  heightened health risks posed to Mr. Patton during this unrestrained

2  pandemic.[33]

3  **2. In the alternative, Mr. Patton is entitled to temporary release under § 3142(i).**

4

5  The Bail Reform Act provides for the "temporary release" of a person in

6  pretrial custody "to the extent that the judicial officer determines such release to

7  be necessary for preparation of the person's defense or for another compelling

8  reason."[34]  Here, temporary release is necessary because Mr. Patton's health

9  conditions in combination with the outbreak at the NSDC creates a compelling

10  reason to grant release.  In almost every conversation with counsel, Mr. Patton

11  discusses how the guards and inmates do not follow social distancing, pass from

12  one unit to the another, even in the BB high-risk unit, without hand washing or

13  face coverings, and numerous other actions that exacerbate the spread of the

14  virus.  Sadly, Mr. Patton, who has never been tested for COVID-19, is so scared

15  that he has written goodbye letters to his children and family in the event he

16

17

18  [33] *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J.,

19  concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d

20  201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case").

21  [34] 18 U.S.C. § 3142(i).

never sees them again and dies alone, gasping for air thousands of miles away in Nevada.

The circumstances that existed when Mr. Patton was ordered detained have now changed.  The virus is spreading through the jail and it poses a direct risk far greater than if Mr. Patton should be release.[35]  The threat of the virus along with Mr. Patton's high-risk status justify temporary release.  *See United States v. Mahan*, Case No. 1:19-cr-233-DCN, Dkt. No. 67 (D. Idaho Apr. 10, 2020) (releasing 36-year-old defendant with significant criminal history, including aggravated assault and parole violations, charged in 10-year mandatory minimum drug case due to compelling risk posed by COVID-19 and defendant's asthma).

### 3. Conditions of Release are Available that Allow Brandon Patton to be Treated Humanely While Also Ameliorating any Risk of Flight.

For Mr. Patton's, his life—not only his liberty—are at risk, creating a powerful incentive to abide by any release conditions the Court may impose and changing the calculus that initially led to the denial of bail in this case.  With the emergence of a global pandemic, Mr. Patton's pre-existing health conditions put him particularly at risk for severe complications.  His medical conditions are

---

[35] According to a COVID-19 tracker, North Dakota currently has 1,017 active cases compared to 46,023 active cases in Nevada.  Ward County, which includes Minot, ND, has 59 active cases.  Clark County, which includes Las Vegas, NV, has 39,529 active cases.  *See generally* https://www.bing.com/covid/local/nevada_unitedstates?form=C19ANS.

1   many and well-documented given the number of medications he currently takes

2   and documented heart condition, with more records to come.  These conditions

3   mean Mr. Patton's continued detention place him in an unacceptable risk of

4   suffering from COVID-19.  Even with his release, Mr. Patton is bound by the

5   terms of his previously entered plea agreement and would have no reason to

6   violate any conditions while on release knowing that he would surely be returned

7   to jail.[36]  He also has reviewed the PSR which lays out the worst-case scenario

8   should he violate the terms of the agreement.  Mr. Patton has taken

9   responsibility for his actions and accepts the years he will spend in jail.  He does

10  not deserve the death penalty.

11      The undersigned has spoken with Mr. Patton's mother and brother

12  numerous times over the past few weeks.  Mr. Patton's mother has moved into a

13  new house that is closer to downtown Minot, ND, and has a room for Mr. Patton

14  to stay while on home confinement. Mr. Patton can also return to the care of his

15  doctor that he was seeing prior to his detention alleviating that expense from the

16  NSDC.

17      Mr. Patton's brother is also gainfully employed and has volunteered to

18  come to Las Vegas, NV to either make sure Mr. Patton has a safe, secure

19  residence to live while in Las Vegas or to accompany him back to North Dakota

20  by either road or air.  Allegiant Airlines offers direct flights from Las Vegas, NV,

21  _____
    [36] ECF No. 22.

to Minot, ND, from $76 to $107, depending on the day.  For example, Mr. Patton could be released in the morning on August 6, 2020, and taken directly to the airport, accompanied by the marshals, pretrial services and/or even the undersigned counsel, for a flight to Minot that leaves at 5:20 p.m.

The chronically ill, no matter what crime they are accused of, pose a lower risk of violating supervision, particularly during a global pandemic during which even leaving the house will endanger their lives.

## **Conclusion**

Mr. Patton is among the vulnerable population at heightened risk of getting very sick from this illness. For all the above reasons, Mr. Patton once again requests his release, even temporarily, so his time in custody does not turn into a death sentence.

In the alternative, Mr. Patton requests an evidentiary hearing to address the concerns for his safety and all precautions currently in place at the NSDC.

Dated:  July 31, 2020.

Respectfully submitted,

RENE L. VALLADARES
Federal Public Defender

By:  */s/Brandon C. Jaroch*

BRANDON C. JAROCH
Assistant Federal Public Defender
Attorney for Brandon Patton

**Certificate of Electronic Service**

The undersigned certifies that he is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on July 31, 2020, he served an electronic copy of the above and foregoing **Second Emergency Motion to Reopen Detention Hearing Due to COVID-19 Pandemic** by electronic service ("ECF") to the person named below:

NICHOLAS A. TRUTANICH
United States Attorney
SHAHEEN TORGOLEY
Assistant United States Attorney
501 Las Vegas Blvd. South
Suite 1100
Las Vegas, NV 89101

*/s/ Marcus A. Walker*
Federal Public Defender Employee